IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Dara R. Cozzi,                               :
                     Petitioner              :
                                             :
        v.                                   : No. 1068 C.D. 2020
                                             : SUBMITTED: July 16, 2021
Unemployment Compensation                    :
Board of Review,                             :
                     Respondent              :

BEFORE:   HONORABLE P. KEVIN BROBSON, President Judge
          HONORABLE PATRICIA A. McCULLOUGH, Judge
          HONORABLE ELLEN CEISLER, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE CEISLER                          FILED: November 17, 2021

        Dara R. Cozzi (Claimant) petitions for review, *pro se*, of the August 26, 2020

Order of the Unemployment Compensation Board of Review (Board) affirming the

decision of a Referee to deny Claimant unemployment compensation (UC) benefits.

The Board determined that Claimant was ineligible for UC benefits under Section

402(b) of the Unemployment Compensation Law (Law)[1] because she voluntarily

quit her employment without cause of a necessitous and compelling nature.  We

affirm the Board's Order.

## Background

        Claimant last worked as a full-time Legal Assistant II for the Pennsylvania

Board of Probation and Parole (Employer) from December 16, 2013 through

October 25, 2019.  Bd.'s Finding of Fact (F.F.) No. 1; Record (R.) Item No. 3.

---

[1] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S. §
802(b).  Section 402(b) of the Law provides that a claimant is "ineligible for [UC] for any week .
. . [i]n which [her] unemployment is due to voluntarily leaving work without cause of a necessitous
and compelling nature."  43 P.S. § 802(b).

Ninety percent of Claimant's job involved working on a computer. Bd.'s F.F. No. 2.

In June 2019, Claimant began experiencing eye issues at work, which substantially affected her vision and caused eye pain. *Id.* No. 3. Claimant sought medical attention and was diagnosed with corneal abrasion. *Id.* Nos. 3, 4. Claimant informed her supervisor that she was having an eye issue and that her eye doctor recommended that she take frequent breaks from the computer to rest her eyes. *Id.* Claimant's supervisor advised Claimant to take breaks from working as needed. *Id.* No. 5. Due to understaffing in her office, however, Claimant did not believe she could take breaks as often as she needed. *Id.* No. 6.

In August 2019, Claimant experienced a second eye issue and returned to her eye doctor. *Id.* No. 7. Several weeks later, on September 30, 2019, Claimant experienced a third eye issue, and her eye doctor referred her to a specialist. *Id.* No. 8. Thereafter, Claimant notified her supervisor that: (1) she was being referred to a specialist for her eye condition; (2) she was unsure if she would return to work that week; and (3) she was unsure how much longer she would be able to perform her job. *Id.* No. 9.

When Claimant returned to work on October 3, 2019, she gave Employer a doctor's note for the three days she had missed due to her eye condition. *Id.* No. 10. At that time, Claimant informed Employer that her doctor recommended that she reduce the amount of time she spends on the computer until she heals. *Id.* No. 11. Claimant's supervisor stated that Employer would accommodate her requested restriction. *Id.* No. 12. Claimant's supervisor asked Claimant if she had enough non-computer work to fill her work days until she healed, and Claimant replied that she did. *Id.* The supervisor also asked Claimant if she needed assistance with any

non-computer-related work matters with an upcoming due date, and Claimant replied that she did not. *Id.*

Employer could have continued to accommodate Clamant by giving her work that did not involve prolonged computer usage. *Id.* No. 13. However, on October 10, 2019, Claimant submitted a resignation letter to Employer without indicating why she was resigning. *Id.*[2] Claimant quit her employment due to her eye condition. *Id.* No. 14.

Claimant filed a claim for UC benefits, which the local UC Service Center granted. The Service Center found, based on the documents in the UC claim record at that time, that Claimant quit her employment for health reasons and Employer failed to offer her alternate work after being notified of her work limitations. R. Item

---

[2] In her October 10, 2019 resignation letter, Claimant stated:

This letter is to serve as an official notification that I will be resigning from my position as a Legal Assistant II with [Employer]. My final day . . . will be Friday, October 25, 2019.

. . . I would like to express my sincere gratitude for the opportunity to serve in this capacity for nearly two years. During this period, I have learned much valuable information related to the area of law and various court systems. I am also grateful for the training and development opportunities made available to me during my tenure with the Commonwealth . . . . As I exit this position, I will take along with me a great deal of beneficial wisdom and also many great memories during my time with [Employer]. . . . [I]t has been a pleasure working with everyone here in our office.

During the remainder of my time with the Office of Chief Counsel, I plan to assist with making this transition as smooth as possible, helping in any way I can. Please do not hesitate to let me know if there is anything additional I can do to aid before I move onto my next adventure.

R. Item No. 3.

No. 7. The Service Center determined that Claimant had a necessitous and compelling reason to voluntarily quit and, thus, she was eligible for UC benefits. *Id.*

Employer appealed to the Referee, who held an evidentiary hearing on February 21, 2020. Claimant, appearing with counsel, testified on her own behalf. Employer presented the testimony of its Law Clerk and Office Manager, Cindy G. Watson, who was Claimant's supervisor at the time of her resignation.

At the hearing, Claimant testified that on a typical work day, she spent 90% of her shift working on a computer. Notes of Testimony (N.T.), 2/21/20, at 9. Claimant believed that she would not be able to fill an entire shift with non-computer work because "everything that we do is primarily done on a computer" and "there is not sufficient [non-]computer[-]related work to fill a work day." *Id.* at 9-10.

Claimant described the eye problems she began experiencing in June 2019. Claimant testified that, in June 2019, she experienced "burning, tearing[,]" and "extreme discomfort and pain in [her] eye while [she] was at work." *Id.* at 10. At that time, her eye doctor diagnosed her with corneal abrasion, but "later [she] found out through further occurrences of this same event that it was not simply an abrasion, . . . [she] was actually experiencing . . . recurrent corneal erosions." *Id.*

Shortly after this first eye occurrence, Claimant spoke with Ms. Watson and informed her that Claimant was "in a bandaged contact that [she] was using until [she] healed." *Id.* She also informed Ms. Watson that her eye doctor advised her "to take frequent breaks from the computer usage that [she] performed during [her] shift to give [her] eyes a break, since this [eye problem] was trying to heal." *Id.* at 11. According to Claimant, Ms. Watson "acknowledged [the doctor's recommendation] and encouraged [Claimant] to take those breaks as needed." *Id.* Claimant testified, however, that this accommodation "was not always workable"

4

for her, because her office "had been consistently understaffed . . . since the previous February." *Id.* at 12. Claimant explained:

> It was very difficult to even take normal breaks some days. And I had difficulty in doing this because of the workload. There were also days when I was covering the office alone and[] . . . the phone was ringing and things needed to be completed. And . . . I was the person that others were coming to for questions and help with assignments or tasks, anything that needed to be done. So I was in demand at that point. It was very difficult, those days, to get the breaks that I needed, especially in this case with needing frequent breaks.

*Id.* Claimant testified that she had expressed to Ms. Watson many times during the course of her employment that she felt "overwhelmed with work." *Id.* at 27. However, she never told Ms. Watson, prior to quitting, that she was going to resign due to understaffing. *Id.*

Claimant testified that she experienced a second eye occurrence on a weekend in August 2019. *Id.* at 12-13. On the following Monday, she notified Employer that she would not be at work that day. *Id.* at 13. She was able to see her eye doctor a day or two later. *Id.* With regard to her work, Claimant testified that "since these erosions were recurring, . . . [she] was attempting to try to follow the initial recommendation of [her] doctor to take frequent breaks when [she] was at work." *Id.*

Claimant testified that she experienced a third eye occurrence in September 2019. *Id.* At that time, her eye doctor referred her to a corneal specialist. *Id.* at 14. Claimant testified:

> I informed [Ms. Watson] that I still could not see to drive, so I would not be coming into work. I told her that I was being referred to a specialist[] . . . . And I told her that I was not sure when I was actually coming back to work that week. And when I did return, I provided a doctor's note for the three days that I had missed.

*Id.*[3] When she returned to work after her specialist appointment, Claimant told Ms. Watson that she "was not sure how much longer [she] could continue to do the job." *Id.* at 27.

Claimant then testified about text messages she had exchanged with Ms. Watson after her third eye occurrence, which were entered into evidence. The messages were dated between September 30, 2019 and October 7, 2019. *See id.* at 15-18 & Exs. C-1 & C-2. With regard to the final text message, dated October 7, 2019, Claimant testified:

> [In this message], I'm notifying [Ms. Watson] that since my appointment is in the mid-day, I might not be returning to work. . . .
>
> . . . .
>
> . . . The thread continues on October 7th with some back and forth regarding what the outcome of the appointment was, because [Ms. Watson] had asked me to update her. . . .

N.T., 2/21/20, at 17. That same day, after her appointment with the corneal specialist, Claimant texted Ms. Watson:

> [M]y corneas are just ripply/bumpy on the surface. It can be caused by long[-]term dry eye and many other things including irritants to the eye and any allergies. Basically because my corneas are bumpy it increases my risk of current erosions . . . .
>
> . . . .
>
> We are going to work from the conservative treatment through more aggressive . . . procedures to give this a chance to continue healing. . . .

---

[3] The doctor's note Claimant provided to Employer did not identify any restrictions on her ability to work. *See* N.T., 2/21/20, Ex. C-3; Ref.'s Order, 3/6/20, at 3.

6

*Id.*, Ex. C-2. Claimant testified that, following these text communications, Ms. Watson offered "no additional accommodations" to Claimant, "[d]espite that [she] suffered all th[o]se months with recurring erosions," and "was . . . referred to a specialist who diagnosed [her] with an actual disorder." N.T., 2/21/20, at 18.

Claimant testified that she began actively searching for another job that would involve less computer work, but she was not offered any positions. *Id.* at 18-20. Claimant did not notify Ms. Watson that she was attempting to find another job because she "was concerned that it may create a negative environment" in the office. *Id.* at 20.

Claimant acknowledged that she did not state her reason for quitting in her resignation letter to Employer. *Id.* She explained why she omitted that information as follows:

> It had been my experience in the past in working for [Employer], and in the office setting[,] . . . that a lot of personal information at various times had been[] . . . spread around the office or[] . . . through office gossip and whatnot. And I didn't wish to have others questioning me as to what my health issues were, nor did I want to include what my actual diagnoses were in my letter of resignation.

*Id.* Claimant testified, however, that she had discussed her resignation with Employer "some time during that week" before she submitted the resignation letter. *Id.* at 21.

Ms. Watson then testified on Employer's behalf. Ms. Watson testified that she and Claimant had discussed her possible resignation before she resigned; however, at that time, Claimant had offered a different reason for possibly resigning:

> [Claimant] and her father were not getting along that well, and . . . he planned to get his own apartment, which would leave [Claimant] without free daycare. And her concern was not being able to be home

with her daughter. And . . . she would like to spend – her daughter was to have gone to kindergarten th[at] year, but did not because she has some issues that I'd rather not touch on. That's [Claimant's] business. But she wanted to be home with her daughter to make sure that she was ready for kindergarten in 2020.

*Id.* at 32-33. Ms. Watson testified that Claimant did not mention health problems as a reason for wanting to resign. *Id.* at 33. When asked if she accommodated Claimant's request for frequent breaks beginning in June 2019, Ms. Watson replied, "Absolutely." *Id.*

Ms. Watson agreed with Claimant's testimony that the office had been understaffed and testified that "[they] . . . all felt overworked at times." *Id.* at 33-34. With regard to Claimant's request to take frequent breaks, Ms. Watson testified: "[Claimant and I] met, we went over what [Claimant] was doing. I volunteered to take some of what she had. We talked about different ways[] . . . that we could begin doing our processors [sic] to make it a little less intense." *Id.* at 34. Ms. Watson explained: "[A]s [Claimant] went through these [eye] episodes, I would always check with her. I'd check in in the morning, see how she was doing; check in in the afternoon, see how she was doing. She, honestly, did mention dust, because our offices can be dusty. . . ." *Id.* Ms. Watson also testified that she gave Claimant her own office so that Claimant could control the lighting in her workspace, which had been causing her to experience migraines. *Id.* at 29, 34.

Ms. Watson acknowledged that Claimant had spoken with her several times about her eye issues between June and October 2019, but "[n]ot specifically [about] what [the diagnosis] might be." *Id.* at 36. When asked if she was aware that Claimant's eye condition was not improving, Ms. Watson replied: "I am not a doctor. I'm not an ophthalmologist. I couldn't make that decision. I can tell you there were episodes." *Id.*

8

Ms. Watson testified about the accommodations Employer offered to Claimant for her eye issues as follows:

> I gave [Claimant] an office of her own. I told her to take as many breaks as [she] needed. I asked her when she was suffering the one time, would she like me to give her work that wasn't computer[-]related. I did everything that I could to accommodate what she shared with me. I'm not a mind reader.
>
> . . . .
>
> When I have an employee who has an issue, I will find work for them to do to accommodate whatever their medical issue is at the time.
>
> . . . .
>
> [Claimant] said she had enough work. . . . She said she had enough non-computer work to keep her busy.
>
> . . . .
>
> I asked her specifically, . . . do you have enough work to do? Do you need something? [Claimant] said no, I have enough here that I can work on without using the computer, for that period of [time].

*Id.* at 37-38. Ms. Watson then elaborated on the type of non-computer work that would have been available to Claimant:

> She could have worked in our law library. She could have done other work that I normally do that isn't related to being on the computer. We could have had her copying. We could have had her scanning for the attorneys. There were several things. And we could have seen if our Chairman's Office had anything that she could help with.

*Id.* at 38.

Following the hearing, the Referee reversed the Service Center's decision. The Referee concluded:

9

[C]laimant has shown that she has a serious [eye] problem and conveyed the information to . . . [E]mployer with the recommendations provided to her by her eye doctor. *[E]mployer provided . . . [C]laimant with accommodations, including reduced computer work, work office with better lighting, and allowed [C]laimant to have frequent breaks. [C]laimant chose not to take the frequent breaks because of the workload. [C]laimant did not take advantage of the supervisor's offer to reduce [C]laimant's amount of computer work with alternate duties.* [C]laimant returned to work after the [third] occurrence, with a doctor's statement that did not indicate any restrictions or need for accommodations. The supervisor continued to check with [C]laimant on her condition. *[C]laimant did not advise the supervisor that she was contemplating voluntarily terminating her employment because of the continued amount of computer work she was doing, or that she did not feel that she could take her needed breaks.* [C]laimant did not [pursue] other options to resolve the problem and [to] remain employed by checking with the chief counsel, the human resources office, her union, or the office of general counsel.

Ref.'s Order, 3/6/20, at 3 (emphasis added). The Referee found that Claimant did not sustain her burden of proving that she had a necessary and compelling reason for voluntarily quitting. *Id.* Therefore, the Referee concluded that Claimant was ineligible for UC benefits under Section 402(b) of the Law. *Id.*

Claimant appealed to the Board, which affirmed the Referee's decision. The Board credited Claimant's testimony that she suffered an eye condition affected by prolonged computer work and that she informed Employer that she needed to take frequent breaks. Bd.'s Order, 8/26/20, at 3. However, the Board made the following additional credibility findings:

While [C]laimant testified[ that] she was unable to take all the breaks she needed due to staffing issues and workload, *there is a lack of evidence that she communicated that her accommodations were not being met to her supervisor. [C]laimant's supervisor only testified to having a general conversation with [C]laimant about being*

10

*overwhelmed with work and the [Board] credits that testimony.* If the employer is unaware that an accommodation is not being met, it cannot take steps to correct the problem.

Further, [C]laimant testified that her doctor informed her after her third occurrence that she should do non-computer[-]related work due to her condition. *The Board credits the [written] statement in evidence authored by [E]mployer's witness[, Ms. Watson,] wherein [Ms. Watson] indicated that [C]laimant informed her of the need for non-computer work until she healed. However, the Board also credits [Ms. Watson's] statement and testimony that when she asked [C]laimant if she had enough non-computer work to fill her days until she healed[, C]laimant responded that she did, and when [Ms. Watson] asked [C]laimant if she needed any help with [non-]computer[-]related tasks with upcoming deadlines[, C]laimant responded that she did not. The Board does not credit [C]laimant's contrary testimony that she was not offered non-computer work as an accommodation.* Therefore, the Board finds [that E]mployer offered [C]laimant a reasonable accommodation. [C]laimant quit despite that accommodation.

*Id.* (emphasis added).

The Board determined that Claimant voluntarily quit without necessitous and compelling cause and failed to take reasonable steps to preserve her employment before quitting. *Id.* at 3-4. Therefore, the Board concluded that Claimant was ineligible for UC benefits under Section 402(b) of the Law. *Id.* at 4. Claimant now petitions for review of that decision.[4]

### Analysis

A claimant who becomes unemployed by voluntarily terminating her employment "bears the burden of proving that the termination was for cause of a necessitous and compelling nature." *Lee Hosp. v. Unemployment Comp. Bd. of Rev.*,

---

[4] Our scope of review is limited to determining whether the necessary factual findings are supported by substantial evidence, whether an error of law was committed, or whether constitutional rights were violated. Section 704 of the Administrative Agency Law, 2 Pa. C.S. § 704.

637 A.2d 695, 697 (Pa. Cmwlth. 1994); *see* 43 P.S. § 802(b). A health problem can provide a necessitous and compelling reason to voluntarily quit in some circumstances. *Genetin v. Unemployment Comp. Bd. of Rev.*, 451 A.2d 1353, 1355 (Pa. 1992). To establish a health problem as a compelling reason to quit, the claimant must: (1) offer competent testimony that adequate health reasons existed to justify the voluntary termination; (2) have informed her employer of the health problem; and (3) be available to work if reasonable accommodations can be made. *Lee Hosp.*, 637 A.2d at 698. "Failure to meet any one of these conditions bars a claim for [UC]." *Id.* Further, "a claimant who desires to quit a job for health reasons must communicate her health problem[] to her employer so the employer can attempt to accommodate the problem." *Blackwell v. Unemployment Comp. Bd. of Rev.*, 555 A.2d 279, 281 (Pa. Cmwlth. 1989).

First, Claimant asserts that the Board erred in concluding that she is ineligible for UC benefits because the evidence showed that Employer failed to comply with Commonwealth of Pennsylvania, Governor's Office Management Directive 205.25, titled "Disability-Related Employment Policy" (Management Directive), in handling her accommodation requests.

Claimant devotes a significant portion of her appellate brief to arguing that Ms. Watson did not have the authority to make the accommodations she made, did not forward Claimant's request for accommodation to Employer's disability coordinator, and did not provide additional long-term accommodations as allegedly required by the Management Directive. *See* Claimant's Br. at 17-25. However, Claimant did not raise these issues before the Referee, nor did she present any evidence relating to the Management Directive at the Referee's hearing. Claimant also did not raise these issues in her initial appeal to the Board. The first time

12

Claimant raised these issues was in a "Supplement to Appeal" that she filed with the Board three months after filing her appeal, to which she appended a copy of the Management Directive.

It is well settled, however, that both the Board and this Court are prohibited from considering such extra-record evidence. This Court has held that "[t]he [Board] cannot review evidence that was not submitted to the Referee, unless it directs the taking of additional evidence." *Umedman v. Unemployment Comp. Bd. of Rev.*, 52 A.3d 558, 564 (Pa. Cmwlth. 2012); *see* 34 Pa. Code § 101.106 (stating that in an appeal from a referee's decision, "the Board may review both the facts and the law pertinent to the issues involved *on the basis of the evidence previously submitted*, or direct the taking of additional testimony") (emphasis added). This Court also cannot consider evidence that is not part of the certified record on appeal. *Umedman*, 52 A.3d at 564; *see Grubbs v. Pa. Bd. of Prob. & Parole*, 481 A.2d 1390, 1391 (Pa. Cmwlth. 1984) ("[N]either the [agency] in its decision[]making process, nor this Court in a review of that process, may consider any matters not made a part of the record when counsel and the litigants are present.").

In her Supplement to Appeal, Claimant asserted that she was unaware of the Management Directive at the time of the Referee's hearing and did not discover it until after she filed her appeal with the Board. *See* R. Item No. 18. However, Claimant failed to explain why she could not have discovered the Management Directive with the exercise of reasonable diligence before the hearing, particularly when she was represented by counsel in the proceedings before the Referee. *See Croft v. Unemployment Comp. Bd. of Rev.*, 662 A.2d 24, 28 (Pa. Cmwlth. 1995) (*en banc*) (concluding that the Board may not consider post-hearing factual communications, as it is restricted to the facts and law pertinent to the issues on the

13

basis of the evidence previously submitted; thus, the Board was justified in refusing to consider evidence attached to the claimants' briefs that was not entered into the record); *Helverson v. Workmen's Comp. Appeal Bd. (Cent. Foundry Co.)*, 463 A.2d 1243, 1247 (Pa. Cmwlth. 1983) (recognizing that a remand will not be granted for presentation of newly discovered evidence that could have been discovered through reasonable diligence at the time of the agency hearing). Therefore, we conclude that the Board properly declined to consider Claimant's supplemental evidence and arguments relating to the Management Directive.[5]

Next, Claimant asserts that the Board erred concluding that she is ineligible for UC benefits when evidence in the UC claim record shows that, despite Ms. Watson's testimony to the contrary, Employer failed to provide Claimant any accommodations for her worsening eye condition. We disagree.

In particular, Claimant points to Employer's responses on the Employer Questionnaire completed shortly after Claimant filed her initial UC claim. *See* Claimant's Br. at 27. The Employer Questionnaire was completed by Stephanie Festog, a claims analyst with Employer's third-party claims administrator. *See* R. Item No. 3. On the Questionnaire, when asked, "Did you offer other work to the claimant," Ms. Festog replied, "No." *Id.* When asked, "[W]as continuing work available within the claimant's limitations had the claimant not separated [from her employment]," Ms. Festog replied, "Yes." *Id.* Ms. Festog did not respond to the question, "[P]lease explain why the work was not offered to the claimant." *Id.*

---

[5] Furthermore, in her "Supplement to Appeal," Claimant did not request a remand to the Referee or a supplemental hearing to present evidence relating to the Management Directive. She merely asked the Board to consider what she deemed to be "additional information and facts essential to reaching an appropriate decision in [her] case," averring that "the issues [relating to the Management Directive] are part of the record in this matter." R. Item No. 18.

14

Despite these representations by Employer's third-party claims analyst, the Board chose to credit the testimony of Claimant's direct supervisor, Ms. Watson, that: she advised Claimant to take breaks as needed; she asked Claimant if she had enough non-computer work to fill her days until she healed and if she needed any help with non-computer tasks with upcoming deadlines; and Employer could have continued to accommodate Claimant by giving her work that did not involve prolonged computer usage. Bd.'s F.F. Nos. 5, 12, and 13. Claimant's attempt to cast doubt on Ms. Watson's credibility by pointing to contrary evidence in the record is insufficient to establish that the Board's findings are unsupported by substantial evidence. *See Ductmate Indus., Inc. v. Unemployment Comp. Bd. of Rev.*, 949 A.2d 338, 342 (Pa. Cmwlth. 2008) ("It is irrelevant whether the record contains evidence to support findings other than those made by the [Board as] fact[]finder; the critical inquiry is *whether there is evidence to support the findings actually made*.") (emphasis added).

Claimant also contends that Employer failed to produce any documentary evidence to corroborate Ms. Watson's testimony and written statement. Claimant asserts that "Employer should have been expected to provide some form of documentation supporting [Ms. Watson's] claims that accommodations were provided in order to meet its burden . . . ." Claimant's Br. at 29. Claimant also asserts that "[w]hen an employer makes a verbal claim or statement in the absence of any supporting documentation, it does not meet its burden of showing the availability of continuing work, or in this particular case, of providing accommodations." *Id.* Contrary to Claimant's assertions, however, the Board's factual findings can be based on testimony alone; corroborating documentary evidence is not required. *See Holt v. Unemployment Comp. Bd. of Rev.*, 840 A.2d

15

1071, 1073 (Pa. Cmwlth. 2004) (concluding that testimony alone, if credited by the Board, is substantial evidence sufficient to support a finding of fact).

At the hearing, Ms. Watson testified: "I told [Claimant] to take as many breaks as she needed. I asked her when she was suffering the one time, would she like me to give her work that wasn't computer[-]related. I did everything that I could to accommodate what she shared with me. . . ." N.T., 2/21/20, at 37. This testimony was consistent with Ms. Watson's prior written statement, where she stated:

> [Claimant] did advise me, at that time, that she was being treated for the eye issue and that the treating physician had instructed her to reduce the amount of time she spent on the computer until her eye healed. At that time, I advised [Claimant] that we would accommodate her physician's advice.

R. Item No. 8. The Board expressly credited Ms. Watson's testimony and written statement and discredited Claimant's contrary testimony that she was not offered non-computer work. Bd.'s Order, 8/26/20, at 3. This Court will not disturb the Board's credibility determinations on appeal, as they are supported by the evidence of record. *See Serrano v. Unemployment Comp. Bd. of Rev.*, 149 A.3d 435, 439 (Pa. Cmwlth. 2016) ("Questions of credibility . . . are within the sound discretion of the Board[] and are not subject to re-evaluation on judicial review.").

Finally, Claimant asserts that Employer failed to provide any long-term accommodations for her deteriorating eye condition after Claimant informed Ms. Watson that she was referred to a specialist and was unsure how much longer she could do her job. *See* Bd.'s F.F. No. 9. After making this statement, however, Claimant returned to work on October 3, 2019, and told Ms. Watson only that her doctor recommended that she reduce the amount of time she spends doing computer work until she healed. *Id.* No. 11; R. Item No. 8. The doctor's note Claimant

16

provided upon her return to work also did not identify any restrictions on her ability to work. *See* N.T., 2/21/20, Ex. C-3; Ref.'s Order, 3/6/20, at 3.

The evidence of record establishes that the only restriction Claimant communicated to Employer before quitting was that she needed frequent breaks from computer work. Claimant testified:

[Employer's Representative:] [T]hese frequent breaks, according to your testimony, was that your supervisor encouraged you to take frequent breaks.

[Claimant:] Yes.

[Employer's Representative:] *And that restriction, or need, never changed between the time of the first [eye] incident continuing to October?*

[Claimant:] *Correct.* It was a progressively – basically, it would recover to the point where I needed few breaks. *And then it would happen again, and then they would tell me the same thing. So, yes*.

[Employer's Representative:] Right. But[] . . . *Ms. Watson was always supportive in that, take whatever you need, do whatever you need, correct?*

[Claimant:] *Yes.*

. . . .

[Employer's Representative:] . . . [Ms. Watson] was willing to accommodate the need to have frequent breaks?

[Claimant:] *That's correct.*

[Employer's Representative:] *But other than that, there [were] no other restrictions you placed on your ability to work, correct?*

[Claimant:] *That is correct.*

17

N.T., 21/21/20, at 24-25 (emphasis added).  Ms. Watson also credibly testified that she provided the following accommodations to Claimant:

> I gave [Claimant] an office of her own.  I told her to take as many breaks as she needed.  I asked her when she was suffering the one time, would she like me to give her work that wasn't computer related.  I did everything that I could to accommodate what she shared with me.  I'm not a mind reader.

*Id.* at 37.

Employer offered Claimant the precise (and only) accommodation she requested for her eye condition:  frequent breaks from computer work.  A claimant who leaves work for health reasons is ineligible for UC benefits "if the employer provides alternative work [that] is compatible with the [claimant's] disability." *Leonarczyk v. Unemployment Comp. Bd. of Rev.*, 397 A.2d 49, 50 (Pa. Cmwlth. 1979); *see Cent. Data Ctr. v. Unemployment Comp. Bd. of Rev.*, 458 A.2d 335, 337-38 (Pa. Cmwlth. 1983) ("[A] claimant need only communicate [her] medical difficulties to [her] employer, and *stand ready to accept any reasonable accommodation offered by the employer*.") (emphasis added).  "[U]nless the requirements of the job being offered are *so obviously beyond the physical capabilities of the claimant as to involve an unreasonable risk of injury*, *then the claimant must make a reasonable effort* before declaring [that] she cannot perform the duties." *Leonarczyk*, 397 A.2d at 50 (emphasis added).[6]  Although Claimant

---

[6] In *Fetterman v. Unemployment Compensation Board of Review*, 467 A.2d 402, 404 n.2 (Pa. Cmwlth. 1983) (emphasis added), this Court explained:

> Although we are aware that [the Supreme Court's decision in] *Genetin* . . . obviated the requirement that the employee attempt to initiate or effectuate a transfer to more suitable work, *we are equally cognizant, however, of the employee's responsibility to remain available to the employer if reasonable accommodations can be made by the employer which are not inimical to the employee's health.*

18

argues that Employer never offered her suitable work to accommodate her eye condition, the Board credited Employer's evidence to the contrary.

Furthermore, there is no indication in the record that Claimant ever informed Employer that the accommodations provided were inadequate before she voluntarily quit. In fact, in Claimant's October 7, 2019 text message to Ms. Watson, after her appointment with the corneal specialist, Claimant stated, "I will see you tomorrow and let you know if anything changes by morning . . . *back to normalcy hopefully*[.]" N.T., 2/21/20, Ex. C-2 (emphasis added); *see also* N.T., 2/21/20, at 13 (Claimant testified that after the third eye occurrence, she "was attempting to . . . follow the initial recommendation of [her] doctor to *take frequent breaks when [she] was at work*") (emphasis added). Three days later, Claimant quit her employment. Bd.'s F.F. No. 13. Claimant never informed Employer that she was contemplating quitting due to her eye condition, nor did she inform Employer of any reason for quitting in her resignation letter.[7] *Id.*; Bd.'s Order, 8/26/20, at 3; *see Bonanni v. Unemployment Comp. Bd. of Rev.*, 519 A.2d 532, 536 (Pa. Cmwlth. 1986) ("We fail to see how an employer can make a reasonable accommodation when that employer does not know what is reasonable.").

---

[7] The claim record shows that, in her initial interview with UC authorities, Claimant offered the following reason for resigning from her employment:

> I used sick time for travel time to and from work and appointments because I was not afforded the opportunity to have time to work from home like others. The staffing levels at the office made me feel like *there was no choice but to resign because I was not able to take time off for the weeks needed for me to recover from a potential surgery because of staffing at the office.*

R. Item No. 6 (emphasis added).

## Conclusion

Based on the credible evidence of record, we conclude that Claimant failed to satisfy her burden of proving that she had a necessitous and compelling reason to voluntarily quit her employment.[8]  Accordingly, we affirm the Board's Order.

_____
ELLEN CEISLER, Judge

---

[8] In her appellate brief, Claimant also challenges the Board's finding that Employer gave her an office so that she could control the lighting in order to reduce the frequency of her migraines, asserting that there is "no evidence" to support such a finding.  Claimant's Br. at 35.  The record, however, contradicts this assertion.  Claimant testified:

> [Employer's Representative:]  [I]sn't it true that your supervisor[, Ms. Watson,] actually put you in an office?
>
> [Claimant:]  She did, yes.
>
> [Employer's Representative:]  So that you could control the lighting?
>
> [Claimant:]  Oh, that's true.

N.T., 2/21/20, at 29.  This testimony was also corroborated by Ms. Watson.  *See id.* at 34.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Dara R. Cozzi,                            :
                    Petitioner           :
                                          :
        v.                                :   No. 1068 C.D. 2020
                                          :
Unemployment Compensation                 :
Board of Review,                          :
                    Respondent            :

## **O R D E R**

AND NOW, this 17th day of November, 2021, we hereby AFFIRM the August 26, 2020 Order of the Unemployment Compensation Board of Review.

_____
ELLEN CEISLER, Judge